United States Court of Appeals
Fifth Circuit

**F I L E D**

**August 4, 2004**

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS
FIFTH CIRCUIT**

_____

Case No. 04-10001

Consolidated with
Case No. 04-10004

_____

In The Matter Of: MIRANT CORP

Debtor

(Matter of Debtor's Motion for Order Authorizing the Debtor to Reject the Back-to-Back Agreement Dated December 19, 2000, and Amendments Thereto, With Potomac Electric Power Company as Executory Contracts)

- - - - - - - - - - - - - - - - - - - - - - - -

MIRANT CORP; MLW DEVELOPMENT LLC; MIRANT AMERICAS ENERGY MARKETING LP; MIRANT AMERICAS GENERATION LLC; MIRANT MID-ATLANTIC LLC; ET AL and OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF MIRANT CORPORATION,

Appellants,

versus

POTOMAC ELECTRIC POWER CO; FEDERAL ENERGY REGULATORY COMMISSION,

Appellees.

and

OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS

_____

Case No. 04-10094

In the Matter of: MIRANT CORPORATION; ET AL

Debtors

- - - - - - - - - - - - - - - - - - - - - - - -

MIRANT CORP; MLW DEVELOPMENT LLC; MIRANT AMERICAS ENERGY MARKETING LP; MIRANT AMERICAS GENERATION LLC; MIRANT MID-ATLANTIC LLC; ET AL and OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF MIRANT CORPORATION

Appellants,

versus

POTOMAC ELECTRIC POWER CO; FEDERAL ENERGY REGULATORY COMMISSION

Appellees

and

OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS

Intervenor.

_____

Appeals from the United States District Court
For the Northern District of Texas

_____

Before BARKSDALE, EMILIO M. GARZA, and PICKERING, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

The issue in this case is whether a district court may authorize the rejection of an executory

contract for the purchase of electricity as part of a bankruptcy reorganization, or whether Congress granted the Federal Energy Regulatory Commission ("FERC") exclusive jurisdiction over these contracts. Mirant Corporation, its various subsidiaries, the Official Committee of Unsecured Creditors of Mirant Corporation, and the Official Committee of Equity Security Holders as an intervenor (collectively "Mirant") argue that the district court's jurisdiction over Mirant's reorganization under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 101 *et seq*. (the "Bankruptcy Code"), allows it to authorize the rejection of certain power contracts. In contrast FERC and the Potomac Electric Power Company ("PEPCO") maintain that because the Federal Power Act, 16 U.S.C. § 792 *et seq* (the "FPA"), grants FERC the exclusive authority to regulate the wholesale rates in contracts for the interstate sale of electric power, any rejection of those contracts must occur in a FERC administrative proceeding. The district court in this case agreed with FERC's position, found the disputed contract to be within FERC's jurisdiction, and held that it lacked jurisdiction to authorize Mirant to reject this contract. Instead the district court held that a FERC proceeding was the proper forum for Mirant to seek relief from any of its power contracts. For the reasons described below, we find that the district court's jurisdictional ruling is erroneous, and that the district court may properly authorize the rejection of an executory power contract in bankruptcy.

I

Mirant is one of the largest regulated public utilities in the United States. It generates, buys, and sells electricity for use by utilities, municipalities, electric-cooperative utilities, and generators across the country. PEPCO is also a regulated public entity responsible for servicing the power needs of residential and commercial consumers in the District of Columbia and Maryland.

Pursuant to state deregulation legislation, PEPCO agreed to sell its electric generation

-3-

facilities and assign most of its purchase power agreements ("PPAs")[1] to Mirant in June 2000 for approximately $2.65 billion in the Asset Purchase and Sale Agreement. The Asset Purchase and Sale Agreement allowed PEPCO to assign all of its PPAs to Mirant, however, a number of the PPAs contained contract language that required PEPCO to obtain the PPA supplier's consent before it could assign that particular PPA. The Asset Purchase and Sale Agreement addressed the possibility that some PPA suppliers would not consent to the assignment of their contracts with PEPCO. The parties agreed to reduce the purchase price by almost $260 million if PEPCO could not obtain consent to assign certain PPAs. They also agreed that any unassigned PPAs would be governed by the terms of a schedule attached to the Asset Purchase and Sale Agreement ("Schedule 2.4"). Under the terms of that schedule, PEPCO would comply with the terms of any unassigned PPAs listed in Schedule 2.4, and Mirant agreed to purchase from PEPCO an amount of electricity equal to PEPCO's obligation under those unassigned PPAs at the rates set in those contracts.

PEPCO did not receive consent to assign two of its PPAs and invoked its Schedule 2.4 rights. The parties filed Schedule 2.4, and FERC approved the rates contained therein. The Schedule 2.4 payments relating to these unassigned PPAs are referred to by the parties, the bankruptcy court, and the district court as the Back-to-Back Agreement. We adopt that term for the sake of consistency. The parties agree that the Back-to-Back Agreement's rate for electricity is higher than the market rate, causing Mirant significant financial losses.

In July 2003, Mirant filed for Chapter 11 bankruptcy. As part of its Chapter 11 reorganization, Mirant filed two motions in an adversary proceeding against FERC and PEPCO.

---

[1] The PPAs are long-term fixed-rate contracts to purchase electricity from outside suppliers that PEPCO used to supplement its energy needs before deregulation.

-4-

First, Mirant filed a motion to reject the Back-to-Back Agreement, but not the Asset Purchase and Sale Agreement, as an executory contract. Second, Mirant sought, and received, an *ex parte* temporary restraining order preventing FERC or PEPCO from taking any actions to "require or coerce [Mirant] to abide by the terms of the Back-to-Back Agreement." Mirant subsequently initiated a second adversary proceeding to obtain another temporary *ex parte* injunction, which prevented FERC from "taking any action directly, or indirectly, to require or coerce [Mirant] to abide by the terms of any Wholesale Contract" on which Mirant either was substantially performing or was not performing pursuant to a court order without giving Mirant ten days advance notice. As this second injunction applied to all of Mirant's wholesale electric contracts and not just to the Back-to-Back Agreement, the parties recognize that this order would implicate hundreds of power contracts that are subject to FERC regulation.

After a hearing before the bankruptcy court, it held that it had the power to enjoin FERC; the authority to authorize Mirant to reject the Back-to-Back Agreement; and that an injunction was necessary in this case to protect its jurisdiction. Specifically, the bankruptcy court recognized that it was not the proper forum to challenge a FERC order, but found that an injunction was needed to protect the reorganization process because any regulatory action FERC took with regard to a particular contract would divest the court of its jurisdiction over that contract. Consequently, the bankruptcy court converted both temporary restraining orders into preliminary injunctions, but did not rule on the merits of Mirant's motion to reject the Back-to-Back Agreement.

The district court then withdrew the reference to the bankruptcy court and held new hearings.[2]

_____

[2] While the district courts have original jurisdiction over all cases under title 11, 28 U.S.C. § 1334, these cases are generally referred to the bankruptcy court. *See* 28 U.S.C. § 157(a). The district court, however, shall withdraw the reference, upon a party's timely motion, in cases where

It concluded that FERC has exclusive authority to determine the reasonableness of the wholesale rates charged for electric energy sold in interstate commerce, and that those rates can only be challenged in a FERC proceeding, not through a collateral attack in state or federal court. The district court found that the only business justification supporting Mirant's motion to reject the Back-to-Back Agreement was the losses it suffered because the rate for electricity that FERC approved for that agreement exceeds the market rate. Based upon this analysis, the district court found that Mirant's rejection motion was a prohibited "attempt to avoid their electric energy purchase payment obligations under the Back-to-Back Agreement at the filed rates FERC has found to be just and reasonable." The district court then held that the Bankruptcy Code does not provide an exception to FERC's authority under the FPA and that Mirant must seek relief from the filed rate in the Back-to-Back Agreement in a FERC proceeding. Based upon this analysis, the district court denied Mirant's motion to reject the Back-to-Back Agreement as well as its request for permanent injunctive relief. In a subsequent order, the district court vacated the bankruptcy court's injunctive relief because it would interfere with the performance of FERC's regulatory oversight functions. It then dismissed the case for failure to state a claim upon which relief could be granted. Mirant appeals each of the district court's orders.

II

"Questions concerning jurisdiction are questions of law. We therefore review the actions of the district court *de novo*." *In re Moody*, 41 F.3d 1024, 1026 (5th Cir. 1995). When faced with a conflict between two statutes, courts must attempt to interpret them so as to give effect to both

"resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce." 18 U.S.C. § 157(d).

statutes. *See Morton v. Mancari*, 417 U.S. 535, 551 (1974) ("The courts are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective.").

A

Brief descriptions of the general authority that a district court has to authorize the rejection of an executory contract under Chapter 11 of the Bankruptcy Code, and of FERC's regulatory responsibility regarding contracts for the interstate sale of electricity under the FPA are necessary before we can determine how those statutes i nteract. Congress intended Chapter 11 to permit troubled enterprises to be restructured so that they could operate successfully in the future. *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 203 (1983). Congress "presumed that the assets of the debtor would be more valuable if used in a rehabilitated business than if 'sold for scrap.'" *Id.* (citation omitted). Further, Congress anticipated that permitting a business to reorganize instead of liquidating would allow it to "continue to provide jobs, to satisfy creditors' claims, and to produce a return for its owners." *Id.*

"Congress intended to grant comprehensive jurisdiction to the bankruptcy courts so that they might deal efficiently and expeditiously with all matters connected with the bankruptcy estate." *Celotex Corp. v. Edwards*, 514 U.S. 300, 308 (1995) (citation omitted). The statute governing a district court's jurisdiction over Chapter 11 filings states that the district courts shall have "original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334(b). That section also provides that the district court "in which a case under title 11 is commenced . . . shall have exclusive jurisdiction of all of the property,

wherever located, of the debtor as of the commencement of such case, and of property of the estate."

28 U.S.C. § 1334(e). Mirant contends that the district court has exclusive jurisdiction under § 1334 over the Back-to-Back Agreement as property of the estate.

Mirant also relies upon the authority it has under § 365 of the Bankruptcy Code to reject that agreement : "[T]he authority to reject an executory contract is vital to the basic purpose of a Chapter 11 reorganization, because rejection can release the debtor's estate from burdensome obligations that can impede a successful reorganization." *In re Nat'l Gypsum* Co., 208 F.3d 498, 504 (5th Cir. 2000) (citing *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 528 (1984)) (alteration in original). Section 365 provides, subject to certain exceptions contained within the Bankruptcy Code, that "the trustee, subject to the court's approval, may assume or reject *any* executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a) (emphasis added).[3]

In addition to the Bankruptcy Code, we must also consider FERC's authority within the regulatory framework established by the FPA. Congress chose to regulate the interstate sale of electricity through the wholesale rates that utility companies are permitted to charge. *See* 16 U.S.C. §§ 824, 824d. Although utility companies determine electricity rates through private contract negotiations, those rates must be filed with FERC and certified as "just and reasonable" to be lawful under the FPA. 16 U.S.C. § 824d(a), (c). FERC has the "exclusive authority to determine the reasonableness of wholesale [electricity] rates" under the FPA. *Mississippi Power & Light Co. v. Mississippi ex rel. Moore*, 487 U.S. 354, 371 (1988). That authority led to the development of the filed rate doctrine, which states that a utility's "right to a reasonable rate [under the Federal Power

---

[3] Section 365(a) does not define executory contract, but the legislative history of that section indicates that the term means a contract "on which performance is due to some extent on both sides." *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 522 n.6 (1984) (citation omitted).

Act] is the right to the rate which the Commission files or fixes, and, . . . except for review of the Commission's orders, [a] court can assume no right to a different one on the ground that, in its opinion, it is the only or the more reasonable one." *Id.* (quoting *Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953, 963-64 (1986)) (alteration and omission in original).

Under the filed rate doctrine, "[t]he reasonableness of rates and agreements regulated by FERC may not be collaterally attacked in state or federal courts. The only appropriate forum for such a challenge is before the Commission or a court reviewing the Commission's order." *Mississippi Power & Light*, 487 U.S. at 375. While FERC has exclusive authority to change a filed rate, this discretion is not completely unfettered. FERC may not change a filed rate solely because the rate affords a public utility "less than a fair return" because "the purpose of the power given to the Commission . . . is the protection of the public interest, as distinguished from the private interests of the utilities. . . ." *Fed. Power Comm'n v. Sierra Pac. Power Co.*, 350 U.S. 348, 355 (1956). Instead FERC can change a filed rate only when "the rate is so low as to adversely affect the public interest) ) as where it might impair the financial ability of the public utility to continue its service, cast upon other consumers an excessive burden, or be unduly discriminatory." *Id.*

Based upon § 1334 and § 365 of the Bankruptcy Code, Mirant claims that it has the right, subject to the district court's approval, to reject any executory contract, including the Back-to-Back Agreement. FERC argues that the FPA preempts the district court's jurisdiction in this case because Mirant's efforts to reject the Back-to-Back Agreement is actually a collateral attack upon a filed rate. We address for the first time, a case arising at the intersection of these two statutes. After carefully examining the authority of each entity, we conclude that the power of the district court to authorize rejection of the Back-to-Back Agreement does not conflict with the authority given to FERC to

-9-

regulate rates for the interstate sale of electricity at wholesale.

B

It is clear that FERC has the exclusive authority to determine wholesale rates, *see Mississippi Power & Light*, 487 U.S. at 371, and Mirant does not contest that it would need FERC approval to either modify the rates in the Back-to-Back Agreement or to completely abrogate that agreement. *Cf*. 11 U.S.C. § 362(b)(4) (creating exception from automatic stay for agencies acting to enforce their regulatory power). Under the Bankruptcy Code, however, Mirant's *rejection* of the Back-to-Back Agreement is a *breach* of that contract. *See* 11 U.S.C. § 365(g) ("[T]he rejection of an executory contract . . . constitutes a breach of such contract. . . ."); *see also In re Continental Airlines*, 981 F.2d 1450, 1459 (5th Cir. 1993) ("[Section] 365(g)(1) speaks only in terms of 'breach.' The statute does not invalidate the contract, or treat the contract as if it did not exist."). Thus, whether the FPA preempts a district court's jurisdiction over a bankruptcy rejection necessarily depends upon whether the FPA generally preempts a district court's jurisdiction over claims of breach related to executory power contracts.

Outside of the bankruptcy context, the FPA does not provide FERC with exclusive jurisdiction over the breach of a FERC approved contract. While the FPA does preempt breach of contract claims that challenge a filed rate, district courts are permitted to grant relief in situations where the breach of contract claim is based upon another rationale. *Gulf States Utils. Co. v. Ala. Power Co.*, 824 F.2d 1465, 1471-73 (5th Cir. 1987); *see also Arkansas Louisiana Gas Co v. Hall*, 453 U.S. 571, 579 n.9 (1981) (declining to disturb a state court decision holding that a party breached a contract that was subject to FERC regulation by failing to comply with state laws that also applied to that contract). For example, *Gulf States* held that the FPA would preempt any breach of contract

claim where damages were sought because a lower rate would have been filed with FERC absent the breach, but there is no preemption if damages were sought because the breach caused an increase in the *quantity* purchased at the filed rate. *Gulf States*, 824 F.2d at 1471. Thus, it is clear that the district court's authority under the general § 365(a) rejection provision permits it to rule on Mirant's motion to reject the Back-to-Back Agreement so long as that rejection does not constitute a challenge to that agreement's filed rate.

Whether rejection of the Back-to-Back Agreement is a challenge to the filed rate, granting the FPA exclusive jurisdiction, is a closer question. The Supreme Court has held that district courts are preempted from awarding breach of contract damage awards calculated using a rate other than the rate filed with FERC. *See Arkansas Louisiana Gas Co.*, 453 U.S. at 584-85. In *Gulf States*, however, we held that courts are not preempted from awarding breach of contract damages based upon a theory that the breach increased the amount that was purchased, so long as damages are calculated using the filed rate. *Gulf States*, 824 F.2d at 1472. Furthermore, *Gulf States* held that courts may set aside an energy contract that was obtained unconscionably or by fraud without interfering with FERC's rulemaking power, so long as that order was not based upon a theory that the filed rate was too high. *Id.* While *Gulf States* recognized that setting aside a contract "would affect the filed rates by eliminating them," it held that the FPA does not preempt such indirect effects. *Id*. at 1472 n.9.

We conclude that the FPA does not preempt Mirant's rejection of the Back-to-Back Agreement because it would only have an indirect effect upon the filed rate. When an executory contract is rejected in bankruptcy, the non-breaching party receives an unsecured claim against the bankruptcy estate for an amount equal to its damages from the breach. *See* 11 U.S.C. §§ 365(g)(1),

502(g).  If Mirant's rejection of the Back-to-Back Agreement was approved, then PEPCO's unsecured claim against the bankruptcy estate would be based upon the amount of electricity it would have otherwise sold to Mirant under that agreement *at the filed rate*.  Thus, the damages calculation from the rejection of a contract is analogous to the damages calculation we previously approved in *Gulf States* because the award calculation is based upon the filed rate.  *See Gulf States*, 824 F.2d at 1471 (damages from breach claims challenging the quantity purchased are not preempted but they must be calculated using the filed rate).

The district court found that Mirant's rejection motion was a challenge to the filed rate because the business justification that Mirant gave for rejecting the Back-to-Back Agreement was that the filed rate exceeded the market rate for electricity.  Mirant has also argued, however, that it does not need the electricity purchased under the Back-to-Back Agreement to fulfill its obligations to supply electricity.  In that situation, Mirant may choose to reject this agreement as unnecessary to its reorganized business because it represents excess capacity in its system to supply electricity.  Section 365(a) permits the bankruptcy estate to select, within certain limits, which executory contracts it will reject and which it will assume.  *See In re Topco, Inc.*, 894 F.2d 727, 741 (5th Cir. 1990) ("In effect, Section 365 allows debtors to pick and choose among their agreements and assume those that benefit their estates and reject those that do not.").  Presumably, a contract's filed rate will be a relevant factor to the bankruptcy estate when it makes this determination.  A debtor's use of the filed rate as a criteria to select for rejection under § 365(a) those contracts which impose the greatest burden upon the bankruptcy estate does not convert that rejection decision into a prohibited collateral attack on the filed rate when the electricity purchased under the rejected contract is not necessary to fulfill a debtor's supply obligations.  *Cf. Gulf States*, 824 F.2d at 1472 ("The district court would have

-12-

jurisdiction if [the debtor] claimed that it cannot take [the supplier's] electricity *regardless of price*. If, however, [the debtor] can fulfill its purchase obligations at lower rate, then [the debtor] merely seeks rate relief not available in district court.").

FERC presents an alternative argument to support its claim that Mirant's rejection motion is a prohibited collateral attack on a filed rate. This argument is based upon the amount that the bankruptcy estate will have to pay to satisfy PEPCO's breach of contract damages claim. FERC concedes that the rejection of the Back-to-Back Agreement would not challenge the filed rate if Mirant guarantees that it would pay PEPCO the full amount of any damages resulting from that breach. However, FERC maintains that anything less than full payment would constitute a challenge to the filed rate because then Mirant would have changed the terms and conditions of the Back-to-Back Agreement by reducing the amount of its contract payments.

FERC's argument is unpersuasive because it is entirely dependant upon Mirant's bankrupt status. It does not challenge Mirant's ability to breach the Back-to-Back contract generally, nor does it challenge the calculation of damages from that breach. Instead, FERC's argument focuses on the amount that Mirant's bankruptcy estate may ultimately have to pay to satisfy PEPCO's damages claim. It is true that Mirant's bankruptcy estate may be able to satisfy PEPCO's breach of contract damages claim without paying the full amount of that claim. However, any amount that PEPCO receives in satisfaction of its breach of contract claim will depend solely upon the terms applicable to unsecured creditors as a class under the reorganization plan as confirmed by the bankruptcy court. *See* 11 U.S.C. § 1129 (describing process for confirming reorganization plan); *see also* 11 U.S.C. § 1141 (discharging preconfirmation debts not paid as part of the reorganization plan). Thus, under FERC's analysis, any effect on the filed rates from a motion to reject would result not from the

-13-

rejection itself, but from the application of the terms of a confirmed reorganization plan to the unsecured breach of contract claims.

In *Gulf States*, we held that a district court could set aside contracts subject to FERC jurisdiction that were obtained unconscionably or by fraud. *Gulf States*, 824 F.2d at 1472. While we acknowledged that this remedy would affect the filed rate by eliminating it entirely, we held that Congress did not mean for the FPA "to preempt such indirect effects." *Id*. at 1472 n.9. Any effect that application of a reorganization plan's terms may have upon the Back-to-Back Agreement's filed rate is even further removed from the contract breach than are the effects of setting the contract aside entirely, and does not cause FPA preemption. Therefore, FERC must rely upon the provisions of the Bankruptcy Code to limit Mirant's ability to reject the Back-to Back Agreement.

The structure of the Bankruptcy Code, however, indicates that Congress did not intend to limit the ability of utility companies to reject an executory power contract. Section 365, along with other Bankruptcy Code sections, details a number of specific limitations on and exceptions to the § 365(a) general rejection authority, including exceptions prohibiting rejection of certain obligations imposed by regulatory authorities. *See, e.g.,* 11 U.S.C. § 365(o) (requiring a trustee to assume "any commitment by the debtor to a Federal depository institutions regulatory agency . . . to maintain the capital of an insured depository institution," and granting priority to any claim of a subsequent breach of this obligation); 11 U.S.C. § 1113 (setting forth requirements for the assumption or rejection of collective bargaining agreements); 11 U.S.C. § 1169 (providing special treatment for the rejection of a railroad lease); 11 U.S.C. § 365(d)(5) (describing the special conditions for deemed rejection of an air carrier's unexpired lease of an airport terminal or aircraft gate); *cf.* 11 U.S.C. § 1110 (setting forth special requirements for the assumption of executory contracts relating to aircraft equipment

and vessels). The Bankruptcy Code does not, however, include an exception prohibiting rejection of, or providing other special treatment for, wholesale electric contracts subject to FERC jurisdiction.

The fact that Congress did not create an exception from § 365(a) rejection for contracts subject to FERC regulation does not appear to be an accident or oversight. It is clear from other Bankruptcy Code provisions that Congress was aware that a debtor's bankruptcy reorganization could implicate the authority of a regulatory rate-setting commission with jurisdiction over that debtor. *See* 11 U.S.C. § 1129(a)(6) (permitting the confirmation of a reorganization plan only when "[a]ny governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval"); *see also* 11 U.S.C. § 362(b)(4) (creating exception from the automatic stay for government agencies acting to enforce their regulatory power). Obviously, Congress knew how to craft specific provisions to protect the rate setting authority of regulatory commissions when it wanted to do so.

In light of the numerous specific exceptions to the general § 365(a) authority to reject contracts that Congress chose to include in the Bankruptcy Code, including those for other contracts subject to extensive regulation, and the absence of any exception for contracts subject to FERC jurisdiction, it is clear that Congress intended § 365(a) to apply to contracts subject to FERC regulation. *Cf. NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 522-23 (1984) ("Obviously, Congress knew how to draft an exclusion for collective-bargaining agreements when it wanted to; its failure to do so in this instance indicates that Congress intended that § 365(a) apply to all collective-bargaining agreements covered by the NLRA."). "When Congress provides exceptions in a statute,

it does not follow that courts have authority to create others. The proper inference, and the one we adopt here, is that Congress considered the issue of exceptions and, in the end, limited the statute to the ones set forth." *United States v. Johnson*, 529 U.S. 53, 58 (2000); *see also TRW Inc. v. Andrews*, 534 U.S. 19, 28 (2001) (where Congress includes specific exceptions to a statute, additional exceptions should not be implied).

The FPA does not preempt a district court's jurisdiction to authorize the rejection of an executory contract subject to FERC regulation as part of a bankruptcy proceeding. A motion to reject an executory power contract is not a collateral attack upon that contract's filed rate because that rate is given full effect when determining the breach of contract damages resulting from the rejection. Further, there is nothing within the Bankruptcy Code itself that limits a public utility's ability to choose to reject an executory contract subject to FERC regulation as part of its reorganization process. Therefore, the district court erred by dismissing Mirant's motion to reject the Back-to-Back Agreement.

C

As part of its order dismissing Mirant's motion to reject the Back-to-back Agreement, the district court also vacated all of the injunctive relief that the bankruptcy court entered in this case. Mirant now requests that we enter injunctive relief *sua sponte* using substantially the same form as the bankruptcy court. Fashioning appropriate injunctive relief depends upon the particular facts and circumstances of a situation, and we leave the task of crafting the language of any injunctive relief in this case to the bankruptcy court. In the interest of judicial efficiency and to provide guidance on remand, however, we will consider whether the bankruptcy court acted within its authority when it previously entered injunctive relief.

-16-

The bankruptcy court issued two separate injunctions in this case that were subsequently vacated by the district court. First, it prohibited either FERC or PEPCO from taking any action to require Mirant to abide by the terms of the Back-to-Back Agreement. Second, it prohibited FERC from taking any action to require Mirant to abide by the terms of any contract subject to FERC regulation with which it was either complying or was not complying subject to a court order without giving Mirant ten days advance notice. We recognize that some injunctive relief is necessary to bring finality to Mirant's rejection decisions and allow the reorganization process to proceed, but the injunctive relief as previously entered was overly broad.

The bankruptcy court issued both of its injunctions under 11 U.S.C. § 105(a), which allows the court to issue any order "that is necessary or appropri ate to carry out the provisions" of the Bankruptcy Code. *Id.*; *see In re Cajun Elec. Power Coop., Inc.*, 185 F.3d 446, 453 n.9 (5th Cir. 1999). The bankruptcy court relied upon its § 105(a) equitable authority because FERC is exempt from the Bankruptcy Code's automatic stay provision. *See* 11 U.S.C. § 362(b)(4) (providing exemption for the "commencement or continuation of an action or proceeding by a governmental unit . . . to enforce such governmental unit's . . . police and regulatory power"). While § 105(a) permits bankruptcy courts to enjoin actions that are excepted from the automatic stay by § 362(b)(4), *see In re Cajun Elec. Power*, 185 F.3d at 457 n.18., this authority is typically used to stop proceedings excepted under § 364 only "in exceptional circumstances." *Id.* (citing *Corporacion de Servicios Medicos Hospitalarios de Fajardo v. Mora*. 805 F.2d 440, 449 n.14 (1st Cir. 1986)).

The Bankruptcy Code clearly anticipates ongoing governmental regulatory jurisdiction while a bankruptcy proceeding is pending. *In re Cajun Elec. Power*, 185 F.3d at 453; *see also* 11 U.S.C. § 362(b)(4) (creating exemption from automatic stay for administrative agencies exercising their

-17-

regulatory power); 11 U.S.C. § 1129(a)(6) (requiring approval of any rate change in a reorganization plan by the government regulatory agency with the appropriate jurisdiction). FERC has a number of regulatory responsibilities under the FPA that continue while Mirant's bankruptcy case is pending that do not necessarily impact Mirant's ability to reject a contract. *See, e.g.*, 16 U.S.C. § 824a(c) (permitting FERC to require from public utilities, whenever it determines an emergency exists, "such generation, delivery, interchange, or transmission of electric energy as in its judgment will best meet the emergency and serve the public interest"); 16 U.S.C. § 824a(g) (to ensure continuity of service, FERC shall prescribe rules requiring public utilities to accommodate any shortages of electric energy or capacity); 16 U.S.C. § 824e(a) (allowing FERC to modify any filed rate that, after a hearing initiated either upon its own motion or upon complaint, it determines to be unjust or unreasonable).

A court's powers under § 105(a) are not unlimited as that section only "authorizes bankruptcy courts to fashion such orders as are necessary to further the substantive provisions of the Code," and does not permit those courts to "act as roving commission[s] to do equity." *In re Southmark Corp.*, 49 F.3d 1111, 1116 (5th Cir. 1995) (citations and internal quotations omitted). The bankruptcy court's injunctive relief in this case exceeded its authority under § 105(a). The concern that the bankruptcy court expressed)) that FERC could negate Mirant's rejection of an executory power contract by ordering Mirant to continue performing under the terms of the rejected contract)) is certainly a legitimate basis for injunctive relief. For example, a bankruptcy court can clearly grant injunctive relief to prohibit FERC from negating Mirant's rejection by requiring continued performance at the pre-rejection filed rate.[4]

_____

[4] Prohibiting FERC from ordering a debtor to continue performing under a rejected contract's filed rate does not mean that the rejection decision itself was a challenge to the filed rate. We assume for purposes of our discussion of injunctive relief that the filed rate was given full effect in the

Both of the bankruptcy court's injunctions, however, attempted to accomplish the narrow goal of protecting Mirant's right to reject executory contracts by prohibiting FERC from taking *any* action to require Mirant to abide by the terms of those contracts within the scope of its injunctions. Thus, while the bankruptcy court found that injunctive relief was only warranted to prevent FERC from negating Mirant's rejection decisions, the relief that was actually granted implicated all of FERC's regulatory functions with respect to hundreds of contracts. The ten-day advance notice requirement included in the bankruptcy court's second injunction is particularly troublesome because that requirement in effect forced FERC to clear any regulatory action with the bankruptcy court. That requirement is inconsistent with the Bankruptcy Code's assumption that a debtor is subject to ongoing agency regulation while in bankruptcy. *See In re Cajun Elec. Power*, 185 F.3d at 453. Consequently, these injunctions were broader than were necessary to further the purposes of the Bankruptcy Code's rejection provision.

D

As we hold that a district court may authorize the rejection of an executory power contract, we must also address Mirant's argument that we should render judgment on its motion to reject the Back-to-Back Agreement. The procedural posture of this case counsels against that action. Neither the bankruptcy court nor the district court has ruled on the merits of Mirant's motion to reject. Further, important issues must still be resolved before a decision on the merits would be appropriate. For example, it is unclear whether or not the Back-to-Back Agreement is a separate agreement from the Asset Purchase and Sale Agreement for purposes of rejection. *See*, *e.g.*, *Stewart Title Guar. Co.*

---

bankruptcy court's calculation of the breach of contract damages resulting from the rejection of that contract.

*v. Old Republic Nat'l Title Ins. Co.*, 83 F.3d 735, 741 (5th Cir. 1996) ("Where an executory contract contains several agreements, the debtor may not choose to reject some agreements within the contract and not others."). We, of course, express no opinion regarding this issue, and merely note its existence to indicate the significant work that remains. Developing the factual record necessary to answer these questions is the work of the trial courts.

Although the bankruptcy court did not reach the merits of Mirant's motion to reject the Back-to-Back Agreement, its opinion indicated that it may choose to apply a more rigorous standard to Mirant's motion to reject than the usual business judgment standard.[5] Supreme Court precedent supports applying a more rigorous standard to this case. *See Bildisco*, 465 U.S. at 526-27 (applying a more rigorous standard to the rejection of a collective-bargaining agreement under § 365), *superceded by statute as recognized in Am. Flint Glass Workers Union v. Anchor Resolution Corp.*, 197 F.3d 76, 82 (3d Cir. 1999) (Congress overruled *Bildisco*'s rejection standard for collective-bargaining agreements by passing 11 U.S.C. § 1113 to control the rejection of those agreements). The Supreme Court generally required more rigorous scrutiny in *Bildisco* because of "the special nature of a collective-bargaining contract." *See Bildisco*, 465 U.S. at 524. The Supreme Court also included a specific negotiation requirement as part of the *Bildisco* standard to ensure that "the national labor policies of avoiding labor strife and encouraging collective bargaining" reflected in the National Labor Relations Act, 29 U.S.C. § 151, were "adequately served" before rejection was

---

[5] The rejection decision under § 365 is generally left to the business judgment of the bankruptcy estate. *See Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1309 (5th Cir. 1985) ("It is well established that 'the question [of] whether a lease should be rejected . . . is one of business judgment.") (quoting *Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pac. R.R. Co.*, 318 U.S. 523 (1943)) (omissions in original, alteration added); *see also In re Liljeberg Enterprises, Inc.*, 304 F.3d 410, 438 (5th Cir. 2002) (applying *Richmond Leasing* to rejection an executory contract).

permitted *See Bildisco*, 465 U.S. at 526.[6]

The nature of a contract for the interstate sale of electricity at wholesale is also unique. Additionally, Congress found when it passed the FPA that the public has an interest in the transmission and sale of electricity. 16 U.S.C. § 824(a). This includes an interest in the continuity of electrical service to the customers of public utilities. 16 U.S.C. § 824a(g). The FPA and the filed rate doctrine protect the public interest by imposing severe limitations upon a public utility's ability to alter the terms of those contracts after they are certified by FERC. Under the filed rate doctrine, FERC can only approve a change to a filed rate if "the rate is so low as to adversely affect the public interest) ) as where it might impair the financial ability of the public utility to continue its service, cast upon other consumers an excessive burden, or be unduly discriminatory." *Sierra-Pacific*, 350 U.S. at 355. This doctrine does not allow FERC to change a filed rate based upon the purely private concern that the rate "is unprofitable to the public utility." *Id*. Clearly the business judgment standard normally applicable to rejection motions is more deferential than the public interest standard applicable in FERC proceedings to alter the terns of a contract within its jurisdiction. Use of the business judgment standard would be inappropriate in this case because it would not account for the public interest inherent in the transmission and sale of electricity.

Therefore, upon remand, the district court should consider applying a more rigorous standard to the rejection of the Back-to-Back Agreement. If the district court decides that a more rigorous standard is required, then it might adopt a standard by which it would authorize rejection of an

---

[6] "Before acting on a petition . . . to reject a collective-bargaining agreement . . . the Bankruptcy Court should be persuaded that reasonable efforts to negotiate a voluntary modification have been made and are not likely to produce a prompt and satisfactory solution." *Bildisco*, 465 U.S. at 526.

executory power contract only if the debtor can show that it "burdens the estate, [ ] that, after careful scrutiny, the equities balance in favor of rejecting" that power contract, and that rejection of the contract would further the Chapter 11 goal of permitting the successful rehabilitation of debtors. *See Bildisco*, 465 U.S. at 526-27. When considering these issues, the courts should carefully scrutinize the impact of rejection upon the public interest and should, *inter alia*, ensure that rejection does not cause any disruption in the supply of electricity to other public utilities or to consumers. *Cf. id*. at 527. (requiring the bankruptcy court to balance the interests of the debtor, the creditors and the employees when determining what constitutes a successful rehabilitation). The bankruptcy court has already indicated that it would include FERC as a party in interest for all purposes in this case under 11 U.S.C. § 1109(b) and Fed. R. Bankr. P. 2018. We presume that the district court would also welcome FERC's participation, if this case is not referred back to the bankruptcy court.[7] Therefore, FERC will be able to assist the court in balancing these equities.

III

The portion of the district court's order dismissing this case for lack of jurisdiction to authorize the rejection of a contract for the interstate sale of electricity at wholesale is REVERSED, the portion of that order vacating the bankruptcy court's injunctive relief is AFFIRMED, and this case is REMANDED to the district court for proceedings not inconsistent with this opinion. All outstanding motions are DENIED.

---

[7] Mirant asks that we remand this case to the bankruptcy court, but the district court withdrew the reference in this case and accordingly we remand to the district court. Nothing in this opinion, however, should be understood to imply that the district court cannot refer this case back to the bankruptcy court.